UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVETTA GILMORE,

       Plaintiff,                                Hon. Richard Alan Enslen

v.                                                Case No. 1:04-CV-407

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was 41 years of age at the time of the ALJ's decision. (Tr. 12).  She attended college for one year and was previously employed as a nurse's assistant, housekeeper, recruiter, and vocational services coordinator.  (Tr. 12, 93, 97-102).

Plaintiff applied for benefits on April 2, 2002, alleging that she had been disabled since February 2, 2002, due to carpal tunnel syndrome, fibromyalgia, post traumatic stress disorder, anxiety, and menopause. (Tr. 69-71, 87, 227-30).  Plaintiff's application was denied, after which she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 21-68, 232-37).  On January 15, 2004, Plaintiff appeared before ALJ W. Baldwin Ogden, with testimony being offered by Plaintiff and vocational expert, Paul Delmar.  (Tr. 238-78).  In a written decision dated February 18, 2004, the ALJ determined that Plaintiff was not disabled as defined by the Act. (Tr. 11-20).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 3-5).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## **MEDICAL HISTORY**

On January 2, 2001, Plaintiff underwent carpal tunnel decompression surgery. (Tr. 144-45).

On February 12, 2002, Plaintiff was examined by Dr. Steven Ashmead. (Tr. 150). Plaintiff reported that she began experiencing leg pains and headaches after running out of her current medication. Plaintiff appeared anxious and the doctor observed tenderness in Plaintiff's neck, knees, elbows, and hands. Dr. Ashmead diagnosed Plaintiff with a mood disorder and "fibromyalgia like symptoms." The doctor also reported that Plaintiff had a previous history of alcoholism. *Id.*

On April 26, 2002, Plaintiff was examined by Dr. Ashmead. (Tr. 149). Plaintiff reported that she was experiencing pain in her right elbow, as well as difficulty sleeping. She stated that she was "emotionally upset" because "her husband left her and there have been multiple issues around this." Plaintiff reported that she was presently participating in counseling and had been prescribed medication to treat her emotional difficulties. On examination, the doctor observed "multiple tender points consistent with fibromyalgia." *Id.*

On June 13, 2002, Plaintiff's mother completed a questionnaire regarding Plaintiff's activities. (Tr. 104-09). According to her mother, Plaintiff cooks, cleans house, shops, watches her children, reads, watches movies, plays cards, attends sporting events, visits with relatives and neighbors, feeds ducks, plays video games, and cares for her personal needs. (Tr. 104-07). Plaintiff's mother reported that Plaintiff is able to perform these activities without difficulty. *Id.*

On August 25, 2002, Plaintiff participated in a consultive examination conducted by Irwin Greenbaum, Ph.D. (Tr. 155-58). Plaintiff reported that she experiences aches and pain "much

of the time all over her body." (Tr. 155). Plaintiff reported that she suffered sexual abuse as a teenager and recently began participating in therapy to treat her anger and depression. She also reported that she experiences difficulty getting along with others and becomes upset easily. *Id.* Plaintiff reported a long history of drug and alcohol abuse, including ongoing use of crack cocaine. (Tr. 156). Plaintiff appeared "irritable," but the results of a mental status examination were otherwise unremarkable. (Tr. 156-57). Dr. Greenbaum diagnosed Plaintiff with (1) polysubstance dependence, continuous, (2) post-traumatic stress disorder, and (3) dysthymic disorder. (Tr. 157-58). Plaintiff's GAF score was reported as 50. (Tr. 158).

On September 9, 2002, psychiatrist, Dr. H. C. Tien completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 160-73). The doctor concluded that Plaintiff satisfied the Part A criteria for Sections 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 161-67). Dr. Tien determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular impairments. (Tr. 170). Specifically, the doctor concluded that Plaintiff suffered mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. With respect to whether Plaintiff experienced episodes of deterioration or decompensation in work or work-like settings, the doctor reported that there existed "insufficient evidence" from which to make a determination. *Id.* Dr. Tien also reported that Plaintiff suffered from a substance addiction disorder. (Tr. 168).

Dr. Tien also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr.

175-77). Plaintiff's abilities were characterized as "moderately limited" in three categories and "not significantly limited" in seven categories. The doctor observed "no evidence of limitation" with respect to seven categories and with respect to the remaining three categories, the doctor concluded that there did not exist sufficient evidence to rate Plaintiff's limitations. *Id.*

Dr. Tien further concluded that considering Plaintiff did not suffer "physical disabilities" she was "trainable, for unskilled work of gainful employment, if receiving a rehabilitative program of psychotherapy, anti-depressant and group therapy, including AA in a CMH program, if needed." (Tr. 177).

On September 15, 2002, Plaintiff was examined by therapist Terri Sprader. (Tr. 188-90). Plaintiff reported a long history of polysubstance abuse, with crack cocaine constituting her "drug of choice." (Tr. 188). Plaintiff reported that she last used crack cocaine three weeks ago. Plaintiff acknowledged that her drug use has adversely impacted her "family, friends, emotional and physical health, financial, legal, work/school, and religious/spiritual" areas of functioning. *Id.*

Plaintiff reported that she had previously been diagnosed with post-traumatic stress disorder, anxiety, and depression, for which she was presently taking medication. (Tr. 189). She also reported that she had been diagnosed with carpal tunnel syndrome and fibromyalgia. *Id.* Plaintiff appeared "sad," but the results of a mental status examination were otherwise unremarkable. (Tr. 189-90). Plaintiff was diagnosed with cocaine dependence and her GAF score was reported as 50. (Tr. 190).

On November 7, 2002, Dr. Ashmead reported that Plaintiff suffered from the following impairments: (1) fibromyalgia, (2) tendinitis of the wrist, elbow, and trochanteric bursitis, and (3) depression with anxiety disorder. (Tr. 192). The doctor reported that Plaintiff "is an

6

excellent candidate for rehabilitation." Dr. Ashmead further reported that Plaintiff was capable of immediately returning to work, subject to the following limitations: (1) limiting repetitive motion of her upper extremities to "approximately" one hour daily, and (2) she must be permitted a sit/stand option which allows her to "frequently" change positions. *Id.*

On December 23, 2002, Plaintiff was examined by Dr. Ashmead. (Tr. 208-09). Plaintiff reported that she was experiencing back and hip pain which radiated into her right lower extremity. (Tr. 209). The results of a neurological examination were normal and Plaintiff "again. . . had dramatic withdrawal responses to exam." (Tr. 208). The doctor concluded that Plaintiff would benefit from physical therapy and stress reduction treatment. *Id.*

On January 29, 2003, Plaintiff participated in a consultive examination conducted by Dr. James Coretti. (Tr. 193-202). Plaintiff reported that she was experiencing "intermittent" pain in her hips and legs. (Tr. 193). Plaintiff reported that she last worked on November 6, 2002. (Tr. 194). She reported that this employment was terminated because of her performance not because of an inability to perform work activities. *Id.*

Straight leg raising was negative and there was no evidence of atrophy in Plaintiff's lower extremities. (Tr. 196). Patrick's sign[1] was negative. Plaintiff was able to ambulate and heel/toe walk without difficulty. She was able to get on and off the examining table and get in and out of a chair without difficulty. *Id.* The doctor observed no evidence of paravertebral muscle spasm. (Tr. 197). Plaintiff exhibited no tenderness over the trochanteric or ischial bursa, sciatic nerve, or cervical, thoracic, or lumbosacral spine. Plaintiff exhibited equal and active peripheral

---

[1] Patrick's test is used to determine whether a patient suffers from arthritis of the hip joint. This test is also referred to as Fabere's sign. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* P-81 (Matthew Bender) (1996).

pulses. There was no evidence of motor or sensory loss and Plaintiff's deep tendon reflexes were equal and active. *Id.* An examination of her shoulders revealed no evidence of tenderness, motor loss, wasting, winging, or impingement. (Tr. 197-98). Tinel's sign[2] and Phalen's test[3] were both negative. (Tr. 198). Plaintiff participated in grip strength testing, the results of which indicated that she was attempting to manipulate the results. (Tr. 198-99). She exhibited normal range of motion in her cervical and dorsolumbar spine, shoulders, elbows, hips, knees, wrists, and hands. (Tr. 199).

Dr. Coretti reported that Plaintiff "has no positive objective findings upon examination to confirm or coincide with documented subjective complaints." The doctor further stated that he was "at a loss to explain her continued subjective complaints on an organic orthopedic basis." *Id.* Dr. Coretti concluded that "from an orthopedic standpoint, I would not place any restrictions on [Plaintiff's] work activities." (Tr. 200).

On February 12, 2003, Plaintiff reported to Dr. Ashmead that she was "doing relatively well" and that her hip pain had diminished. (Tr. 206). Plaintiff also reported that she was not experiencing "any significant anxiety problems." *Id.* The doctor instructed Plaintiff to continue her participation in physical therapy. (Tr. 205).

On June 25, 2003, Plaintiff was examined by Dr. Ashmead. (Tr. 203). Plaintiff reported that she was experiencing increased stress due to family circumstances. The doctor noted that while Plaintiff had previously been prescribed Wellbutrin, Plaintiff "really never followed up

---

[2] Tinel's test (or Tinel's sign) refers to a tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury. This test is also used to detect the presence of carpal tunnel syndrome. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* T-140 (Matthew Bender) (1996); Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever: Physical Signs of Carpal Tunnel Syndrome*, Hospital Physician, July 2000 at 39.

[3] Phalen's test (or Phalen's maneuver) is a clinical test designed to detect the presence of carpal tunnel syndrome. *See*, *e.g.*, Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever: Physical Signs of Carpal Tunnel Syndrome*, Hospital Physician, July 2000 at 39.

on it." Plaintiff also reported experiencing pain "all over." The results of neurological testing were unremarkable. *Id.*

On August 27, 2003, Plaintiff was examined by psychiatrist, Dr. Maria Gallardo. (Tr. 223-24). Plaintiff was "not very cooperative" and appeared depressed and anxious. (Tr. 223). She was oriented to place, person, and situation, and exhibited intact memory. Plaintiff's thought processes were "devoid of any loose associations, tangentiality or circumstantiality, visual or auditory hallucinations, or paranoid ideation." Dr. Gallardo diagnosed Plaintiff with (1) dysthymic disorder, (2) major depressive disorder, recurrent, and (3) anxiety disorder. Her GAF score was rated as 55. The doctor further observed that Plaintiff "is self-medicating with polysubstances." *Id.* The doctor recommended to Plaintiff that she begin participating in outpatient therapy. (Tr. 224).

Plaintiff testified at the administrative hearing that she performs housework, shops for groceries, cooks, drives, and washes laundry. (Tr. 245-46). She reported that she can bend and touch her knees and her toes. (Tr. 245). Plaintiff reported that she can walk three blocks, sit for one hour, stand for 20-30 minutes, and lift 10 pounds. (Tr. 245-46). Plaintiff reported that she works in her garden. (Tr. 249-50).

Plaintiff reported that she was unable to work due to the effects of carpal tunnel syndrome, fibromyalgia, post-traumatic stress disorder, manic depression, and anxiety. (Tr. 252-55). Plaintiff testified that she experiences pain in her back, hips, and legs. (Tr. 256). She reported that her pain averages 7 (on a scale of 1-10) and regularly increases in intensity to 10. (Tr. 256-58).

With respect to Plaintiff's mental impairments and the treatment she was presently receiving to treat such, the following exchange occurred between Plaintiff and the ALJ:

9

Q: Is there anything you would like to tell me which I have not covered in this series of questions that you would like me to know regarding your ability to function on a job? You may cover anything which I've covered in the course of the questioning and expand on it. You can bring up anything which I've failed to cover that you think I should have covered and you may develop that. You may for the first of two times during the course of the hearing you may say anything you wish to say for as long as you wish to say it. You're not required to make a statement, but you may if you wish for as long as you like. And in any event, you will have a second opportunity to do so before the hearing ends. Is there anything you would like to say at the present time?

A: Yes.

Q: Proceed.

A: I just started the patient partial hospitalization Monday at Pinerest and I've been diagnosed with bi-polar and manic depressive something or other. He's given me two prescriptions. One for Depakote and I really can't pronounce the other one. But I take the Depakote - one in the morning and two at night. And the other one I take one in the morning and one at night.

Q: All right.

A: I started up - I went to the Michigan rehab services and I met with Todd Spotter [phonetic] and he's waiting on some paperwork from these doctors over at Pinerest. He needs the paperwork from Terry Sprater [phonetic] - a update and a update from my doctor, which I have the paperwork for next week. I go see my doctor next week, Dr. Ashmeade.

Q: Okay.

A: He wants to get me in that program because he wants to see where they could best assist me.

10

Q: Excuse me?

A: Assist me.

Q: All right.

A: Because he - when I talked to him last year before he closed my case, he said he didn't think I was ready to go to work with all the stuff that I had been going through. My husband - well, my kids' father - we've been together 17 years, never got married. He left and I didn't take that too well, but I refused to go into the hospital. Instead, I went to - I saw Terry. I got to Women's Connect Group through Cornerstone. Families - Early Impact with Arbor Circle - they come out every Tuesday to counsel me and the kids.

Q: So you have had counseling?

A: Yeah, I forgot about her. She comes every Tuesday at 3:30.

Q: Oh, you have counseling now?

A: Um-hum. It's for me and the kids.

Q: That's because the father left?

A: Yes.

Q: All right. Anything else you want to say?

A: I understand the doctor that I saw - I guess it was - I don't know. He said that he didn't see anything wrong with me. I never said - I never told anybody that I couldn't work. It's just that it's limited what I can do - the sit, stand, and all that other stuff. And people won't give me a job. They -

Q: So you're saying it's difficult for you to find work?

A: Huh?

11

> Q: It's difficult for you to find work?
>
> A: It's difficult for me to have them accept me as an employee.
>
> Q: All right.
>
> A: And it's very frustrating.
>
> Q: Anything else you want to say? Anything else you want to say?
>
> A: I want to work -
>
> Q: All right.
>
> A: - but at this time I can't. I'm not stable, mentally and physically, right now. And I'm trying to get all the help that I can get.
>
> Q: All right.
>
> A: I have all these programs that I have gotten myself into. I have all these skills. I've worked with people with disabilities for five years and now here I am with it and I need help.

(Tr. 261-63).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ found that Plaintiff suffers from depression and carpal tunnel syndrome, severe impairments, which neither alone nor in combination satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13). The ALJ further determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 16-19). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

**1. The ALJ Failed to Fully Develop the Administrative Record**

Plaintiff waived the right to representation at the outset of the administrative hearing and participated therein without the benefit of counsel. Plaintiff does not claim that her waiver of

---

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

counsel was involuntary. Plaintiff does assert, however, that the ALJ failed to properly develop the record in this matter, resulting in "prejudice and unfairness" to her claim for benefits.

While the claimant bears the ultimate burden of establishing that she is entitled to disability benefits, the ALJ has an affirmative duty to develop the factual record upon which his decision rests, regardless whether the claimant is represented. *See*, *e.g.*, *Osburn v. Apfel*, 1999 WL 503528 at *7 (6th Cir., July 9, 1999) (quoting *Richardson*, 402 U.S. at 411) ("the responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge"); *Echevarria v. Sec'y of Health and Human Services*, 685 F.2d 751, 755 (2nd Cir. 1982) (given the non-adversarial nature of a benefits proceeding, the ALJ "must himself affirmatively develop the record").

However, where the claimant is unrepresented, is incapable of "presenting an effective case," and is "unfamiliar with hearing procedures,"[5] the ALJ has "a special, heightened duty to develop the record." *Nabours v. Commissioner of Social Security*, 2002 WL 31473794 at *3 (6th Cir., Nov. 4, 2002) (citing *Duncan v. Sec'y of Health and Human Services*, 801 F.2d 847, 856 (6th Cir. 1986) and *Lashley v. Sec'y of Health and Human Services*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). This heightened duty arises from the remedial nature of the Social Security Act, as well as the recognition that "the ultimate responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge." *Lashley*, 708 F.2d at 1051 (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). To satisfy this duty, the ALJ must "scrupulously and

---

[5] The record contains no evidence that Plaintiff was familiar with the relevant hearing procedures. Furthermore, a review of the transcript of the administrative hearing reveals that Plaintiff failed to understand much of the proceedings and was unable to effectively advocate her position. For example, Plaintiff was unable to effectively cross-examine the vocational expert because she did not understand the word "preclude" which the vocational expert used in expressing his opinions and, furthermore, from Plaintiff's statements it appears that she did not even understand what the term "cross-examine" meant or entitled her to do. (Tr. 272-73).

conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Lashley*, 708 F.2d at 1052 (citations omitted).

Because this assessment is not readily amenable to the application of bright line tests, whether the ALJ has satisfied this special duty is to be determined on a case-by-case basis. *See Osburn*, 1999 WL 503528 at *7 (citation omitted). The absence of a bright line test does not mean, however, that the Court is without guidance when making this assessment. To the contrary, courts have articulated several concerns relevant to this determination.

First, reversal of the ALJ's decision is not warranted simply because an attorney would have better developed the record. Instead, "the key inquiry is whether the administrative law judge fully and fairly developed the record through a conscientious probing of all relevant facts." *Rowden v. Chater*, 1996 WL 294464 at *1 (6th Cir., June 3, 1996). Also, the ALJ is not required, when confronted with an unrepresented claimant, to factually develop matters regarding which he has no notice. *See, e.g., Rowden*, 1996 WL 294464 at *2; *Osburn*, 1999 WL 503528 at *7-8 (6th Cir., July 9, 1999) (a claimant must "support his subjective complaints with objective evidence" before the ALJ can be required to "develop a record" regarding such). As detailed below, the ALJ's failure to fully develop the administrative record cannot be attributed to inadequate notification by Plaintiff.

Failure by an ALJ to fully develop the factual record in a particular matter is often evidenced by superficial or perfunctory questioning, as well as a failure to obtain all available medical records and documentation. *See*, *e.g.*, *Lashley*, 708 F.2d at 1052 (where the claimant "was only superficially questioned concerning his daily activities and his physical limitations," the ALJ

15

failed to "fulfill his duty to develop *fully* the record"); *Rogers v. Sec'y of Health and Human Services*, 1986 WL 16548 at *3 (6th Cir., Feb. 28, 1986) (where the ALJ "did not even inquire into the claimant's emotional problems, or attempt to more fully understand his physical limitations," he failed to fully develop the record); *Echevarria*, 685 F.2d at 755-56; *Frank*, 924 F.Supp. at 428-29 ("the ALJ's cursory examination of [the claimant] was insufficient considering the importance to be accorded a claimant's testimony"). Such was the case here.

As indicated above, Plaintiff testified at the administrative hearing that she had only recently begun "partial hospitalization" treatment for her mental impairments and had been prescribed two medications, only one of which she could identify. Plaintiff testified that she had recently "started up" with Michigan Rehabilitation Services, but failed to describe with any precision the nature of the services she was receiving. Plaintiff also testified regarding in-home counseling she and her children were presently receiving.

The ALJ failed to ask Plaintiff any meaningful questions about any of these topics. More importantly, the ALJ failed to obtain any of the medical records relating to any of these matters. Considering Plaintiff's history of mental impairments, as well as the fact that the ALJ concluded that Plaintiff suffered from depression, the ALJ's failure in this regard is clear error which prejudiced Plaintiff's claim for benefits. The Court further notes that the ALJ failed to even inform Plaintiff that she had the right to keep the administrative record open for a period of time following the hearing should she wish to submit additional evidence.[6] *See* 20 C.F.R. § 404.944. In sum, the

---

[6] Defendant asserts that "the ALJ notified Plaintiff that if she had additional evidence to submit to the ALJ, she should contact him immediately." (Defendant's Brief at 12). However, the correspondence to which Defendant refers, (Tr. 28-29), was sent to Plaintiff *before* the administrative hearing and failed to inform Plaintiff that she could also supplement the administrative record following the hearing.

16

ALJ failed in his duty to "fully and fairly [develop] the record through a conscientious probing of all relevant facts."

Defendant asserts several arguments in support of her position, none of which are persuasive. Defendant argues that the ALJ did not err because he "has the discretion to determine whether further evidence is necessary, such as additional testing, expert testimony, or updated medical records." (Defendant's Brief at 11). While accurate, this notion has no relevance in the present matter as the question presented by Plaintiff's appeal is not whether the ALJ improperly failed to obtain *additional* evidence, but instead whether he failed in his duty to secure the evidence which was already in existence. *See Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).

Defendant next asserts that even if the ALJ erred in failing to fully develop the record, such error is harmless because Plaintiff has failed to demonstrate that the ALJ would have reached a different result had he secured the medical evidence at issue. The Court disagrees. As previously noted, failure by an ALJ to fully develop the record deprives the claimant of a full and fair hearing. As the Sixth Circuit recently held, a court "cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record" to support the ALJ's conclusion. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 546 (6th Cir. 2004). As the court further observed, "to recognize substantial evidence as a defense to non-compliance with [substantial procedural rights], would afford the Commissioner the ability [to] violate the [right] with impunity and render the protections promised therein illusory." *Id.*

The Court recognizes that *Wilson* is factually distinct from the present circumstances, however, the Court finds this distinction insignificant. In *Wilson*, the ALJ failed to articulate a good reason for rejecting the opinion of a claimant's treating physician. *Id.* at 543-45. In rejecting the

17

Commissioner's harmless error argument, the court concluded that the duty to properly explain the reasons for rejecting a treating physician's opinion constituted a "substantial" procedural right "intended primarily to confer important procedural benefits upon individuals." *Id.* at 547. The heart of the *Wilson* court's analysis is that violation of substantial procedural rights are not subject to harmless error analysis. The rule requiring the ALJ to fully develop the evidentiary record is no less a "substantial" procedural right than the rule requiring an ALJ to sufficiently articulate his reasons for discounting the opinion of a treating physician. Thus, the Court finds *Wilson* directly applicable in the present matter.

Finally, the Court recognizes that the ALJ "is under a duty to dispose promptly of claims and avoid unnecessary delays." *Lashley*, 708 F.2d at 1052. Nonetheless, a claimant's right to obtain a full and fair hearing cannot be sacrificed for the benefit of administrative efficiency. The Court is not suggesting that the ALJ intended to produce an unfair result. As the evidence detailed above reveals, however, the ALJ clearly failed to satisfy his obligation to fully develop the factual record in this matter, thus depriving Plaintiff of a fair hearing. Thus, the Commissioner's decision must be reversed.

## CONCLUSION

As articulated herein, the Court concludes that the ALJ violated Plaintiff's right to a full and fair administrative hearing. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  May 19, 2005                                                    /s/ Ellen S. Carmody
                                                                     ELLEN S. CARMODY
                                                                     United States Magistrate Judge